

**CORPORATION SERVICE COMPANY**®

**CXW / ALL**
**Transmittal Number: 10911553**
**Date Processed: 03/05/2013**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | WF West - WF Bank<br>Corporation Service Company- Wilmington, DELAWARE<br>2711 Centerville Rd<br>Suite 400<br>Wilmington, DE 19808 |

| | |
|---|---|
| **Entity:** | Wells Fargo Bank, National Association<br>Entity ID Number  2013649 |
| **Entity Served:** | Wells Fargo Bank, NA |
| **Title of Action:** | Senuhe Lara vs. Mortgage Electronic Registration System, Inc. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Hennepin County District Court, Minnesota |
| **Case/Reference No:** | Not shown |
| **Jurisdiction Served:** | Minnesota |
| **Date Served on CSC:** | 03/05/2013 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | William Bernard Butler<br>612-630-5177 |
| **Client Requested Information:** | Matter Management User Groups: [Service of Process] |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808  (888) 690-2882  |  sop@cscinfo.com

STATE OF MINNESOTA                          DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT

Senuhe Lara and Lorena Martinez,           Case Type: Quiet Title
                                            Civil No.
                    Plaintiff,

v.

Mortgage Electronic Registration System,
Inc., MERSCORP, Inc.,   Wells Fargo
Bank, NA, Reiter & Schiller, PA

                    Defendants.

---

## SUMMONS

---

THIS SUMMONS IS DIRECTED TO: Mortgage Electronic Registration System, 1818 Library Street, Suite 300, Reston, VA 20190; MERSCORP, Inc., 1818 Library Street, Suite 300, Reston, VA 20190; Wells Fargo Bank, NA, 45 Fremont Street, 27th Floor San Francisco, CA 94104.

1. **YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The

Plaintiff's Complaint against you is attached to this summons. Do not throw these papers

away. They are official papers that affect your rights. You must respond to this lawsuit

even though it may not yet be filed with the Court and there may be no court file number

on this summons.

2. **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR**

**RIGHTS**. You must give or mail to the person who signed this summons **a written**

**response** called an Answer within 20 days of the date on which you received this

Summons. You must send a copy of your Answer to the person who signed this summons

William Butler, Esq.
Butler Liberty Law, LLC
33 South Sixth Street
Suite 4100
Minneapolis, MN 55402

3. **YOU MUST RESPOND TO EACH CLAIM**. The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint.  If you do not want to contest the claims stated in the complaint, you do not need to respond.  A default judgment can then be entered against you for the relief requested in the complaint.

5. **LEGAL ASSISTANCE**. You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATIVE DISPUTE RESOLUTION**.  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the

Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

7. **REAL PROPERTY.** THIS LAWSUIT MAY AFFECT OR BRING INTO QUESTION TITLE TO REAL PROPERTY located in HENNEPIN County, State of Minnesota, legally described as follows:

> Lot 31, Block 2, Thorpe Bros. University Club Addition
> ("Property")

The object of this action is Quiet Title.

_____          ___February 14, 2013___
Plaintiff's attorney's signature                                  Dated

__William Bernard Butler_____
Print or type plaintiff's attorney's name

3

STATE OF MINNESOTA                                  DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT

Senuhe Lara and Lorena Martinez,            Case Type: Quiet Title
                                            Civil No.
                    Plaintiff,

v.

Mortgage Electronic Registration System,
MERSCORP, Inc., Wells Fargo Bank, NA,
and also all other persons, unknown
claiming any right, title, estate, interest, or
lien in the real estate described in the
complaint herein

                    Defendants.

---

## COMPLAINT

---

        Plaintiff, for their Complaint, state and allege the following:

    1.    Plaintiff Senuhe Lara and Lorena Martinez reside and are in possession of real

property located at 1633 Blackstone Ave South St. Louis Park, MN 55416 which is

legally described as follows:

            Lot 31, Block 2, Thorpe Bros. University Club Addition.
            ("Property")

    2.    Plaintiff acquired their interest in the Property via Warranty Deed dated March

29, 2004. (Ex.1)

    3.    Defendant Wells Fargo Bank, N.A. ("Wells") is a corporation whose address is

45 Fremont Street, 27th Floor San Francisco, CA 94104.

4.     Defendant Mortgage Electronic Registration System ("MERS") is a Delaware corporation with a principal place of business in Virginia. MERS is not registered to do business in Minnesota. Its headquarters is located at 1818 Library Street, Suite 300, Reston, VA 20190.

5.     Defendant MERSCORP, Inc is a Virginia corporation located at 1818 Library Street, Suite 300, Reston, VA 20190.

## FACTS

6.     On April 15, 2004, Plaintiff executed and delivered a note ("Note") to Centennial Mortgage & Funding, Inc. On May 13, 2004 Plaintiff executed a mortgage ("Mortgage") in favor of MERS, as nominee for Centennial Mortgage & Funding, Inc. (Ex. 2)

7.     Plaintiffs specifically deny that any named Defendant or their predecessor in interest has or had a legal right to declare a default on the Note. Neither Defendant nor their predecessors in interest can prove default in accordance with Article 3 of the UCC.

8.     On August 12, 2010 Reiter drafted an Assignment of Mortgage ("8/12/2010 AOM") from MERS, to Wells Fargo Bank, N.A. which assigns "...the Assignor's interest in the Mortgage ... together with all rights interests in the note and obligations therein specified and the debt thereby secured. Assignor covenants with Assignee, its successors and assigns, that Assignor has good right to sell, assign and transfer the same." China Brown executed the 8/12/2010 AOM as Assistant Secretary of MERS and recorded in the Hennepin County Office of the Recorder on August 13, 2010 as Document No. T4779079. (Ex. 3)

2

9.     Upon information and belief, China Brown did not have the legal authority to execute the 8/12/2010 AOM at the time she executed it. China Brown was not an agent of MERS but in fact, an employee of America's Home Servicing Corporation. (see Private Investigator Affidavit Attached as Exhibit 4)

10.    Also on August 13, 2010, Reiter drafted a Notice of Pendency and Power of Attorney ("8/13/2010 POA"). The 8/13/2010 POA empowers Reiter to foreclose on the Property and to "bid in for the property at the foreclosure sale..." China Brown, executed the 8/13/2010 POA as Assistant Secretary of MERS and recorded it with the Recorder of Hennepin County on August 13, 2010 as Document No.: T4779080 (Ex. 5)

11.    Upon information and belief, China Brown did not have the legal authority to execute the 8/12/2010 AOM at the time she executed it. China Brown was not an agent of MERS but in fact, an employee of America's Home Servicing Corporation. (See Private Investigator Affidavit Attached as Exhibit 4)

12.    On May 29, 2012, Reiter drafted a Notice of Pendency and Power of Attorney ("5/29/2012 POA"). The 5/29/2012 POA empowers Reiter to foreclose on the Property and to "bid in for the property at the foreclosure sale..." Steven R. Pennock executed the 5/29/2012 POA as Steven R. Pennock, Attorney of Reiter & Schiller and recorded it with the Recorder of Hennepin County on May 29, 2012 as Document No.: T4958743 (Ex. 6)

13.    Upon information and belief, Steven R. Pennock did not have the legal authority to execute the 5/29/2012 POA.

3

14.     Minnesota Statutes, section 580.05 requires that all powers of attorney be recorded prior to commencement of a non-judicial foreclosure and the agents authorized to do so:

> When an attorney at law is employed to conduct such foreclosure, the authority of the attorney at law shall appear by power of attorney executed and acknowledged by the mortgagee or assignee of the mortgage in the same manner as a conveyance, and recorded prior to the sale in the county where the foreclosure proceedings are had. If such attorney be employed on behalf of such mortgagee or assignee by an attorney in fact, the attorney's authority shall likewise be evidenced by recorded power.

15.     On June 8, 2012, Wells Fargo Bank, N.A., through Reiter, Noticed a Sheriff's Sale for the subject property and conducted the sale on June 27, 2012. Reiter prepared the Sheriff's Certificate indicating that Reiter had the legal authority to make a credit bid at the sale.   Reiter, on behalf of Wells Fargo Bank, N.A., appeared at the Sheriff's Sale and exercised the power of sale clause in the mortgage by bidding 168,739.96 in debt allegedly due to Wells Fargo Bank, N.A. A Sheriff's Certificate of Sale and foreclosure record is recorded in the Hennepin County Office of the Recorder as Document No. T4982970. (Ex. 7)

16.     On or about April 13, 2011 Reiter received constructive notice that ("Wells"), had engaged in "unsafe and unsound" banking practice in conducting foreclosures.   On this date, Wells entered into an Order and Consent Decree in which Wells did not contest to:

> (1) filing "in state and federal courts affidavits executed by its employees or
>
> employees of third-party service providers making various assertions, such
>
> as ownership of the mortgage note and mortgage...in which the affiant

4

represented that the assertions in the affidavit were based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;" (2) filing "in state and federal courts, or in local land record offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;" (3) commencing "foreclosure proceedings and ...non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;" and (4) that BAC LP "failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services." (Ex. 8)

17. In the April 13, 2011 Order and Consent Decree Wells also agreed to develop an Action Plan and agreed that it would comply with Fannie Mae servicing guides and MERSCORP Rules:

Wells agreed to develop "governance and controls to ensure compliance with all applicable federal and state laws (including the U.S. Bankruptcy Code and the Service-members Civil Relief Act ("SCRA")), rules, regulations, and court orders and requirements, as well as the **Membership Rules of MERSCORP, servicing guides of Government Sponsored Entities ("GSEs")** or investors, including those with the Federal Housing

Administration and those required by the Home Affordable Modification Program ("HAMP"), and loss share agreements with the Federal Deposit Insurance Corporation (collectively "Legal Requirements"), and the requirements of this Order.

18.    Reiter at all times knew or had reason to know that the 8/12/2010 AOM, the 8/13/2010 POA and the 5/29/2012 POA were void.

19.    Plaintiffs maintain they are the owner of fee title and that the sheriffs' certificate of sale is void.

20.    The foreclosure sale was void.

21.    Reiter conducted the void foreclosure.

## COUNT 1: DETERMINATION OF ADVERSE CLAIMS
## MINN. STAT. § 559.01

22.    Plaintiff restates and re-alleges each of the foregoing paragraphs as though fully stated herein.

23.    Plaintiff is personally in possession of the real property.

24.    Defendant Wells Fargo Bank, N.A., and/or other Defendants whose identity is unknown, claims an adverse interest, claim or right to the real property as outlined in this complaint.

25.    In a quiet title action the burden of proof is on the defendant or mortgagee asserting a lien or other adverse interest in the property. *Barber v. Evans,* 6 N.W.445, 446 (1880); 6A Minn. Prac. §54.15 (3d Ed.).   The mortgagee's burden has remained unchanged since the statute was enacted. *See Walton v. Perkins,* 28 Minn. 413 (1881)(

6

defendant bears the burden of proving the nature of his claim.). *See Ehle v. Prosser,* 197 N.W.2d 458 (1972). Both record title and legal title must concur and co-exist at the same time and in the same persons to foreclose by advertisement. *Jackson v. Mortgage Electronic Registration Systems,* 770 N.W.2d 487, 497 (Minn. 2009).

26.     Plaintiff asserts that Defendant must prove its title to the Mortgage by a preponderance of the evidence.

27.     Plaintiff requests a determination of adverse claims of each of the Defendants pursuant to Minn. Stat. § 559.01, et seq.

## COUNT 2: DECLARATORY JUDGMENT
## MINN. STAT. § 555.01, et seq.

28.     Plaintiff restates and re-alleges each of the foregoing paragraphs as though fully stated herein.

29.     Minn. Stat. § 555.02 authorizes a declaration concerning the parties' rights, status or other legal relations to the Property, including the validity of the NOP/POA, Sheriffs Certificate of Sale and QCD instruments. It also allows a declaration concerning the parties' rights, status or other legal relations concerning any obligations arising out of the mortgage and note, including whether the sheriffs certificate of sale or expiration of any redemption period terminated any of the rights, status, legal relations or obligations of the parties.

30.     Plaintiff requests this Court declare:

      a.    That the 8/12/2010 AOM is void;

      b.    That the 8/13/2010 POA is void;

7

c.  That the 5/29/2012 POA is void;

d.  That Plaintiff remains the owner of the property in fee title; and

e.  For such other and further relief concerning the rights, status or other legal relations arising out of mortgage loan transaction.

## COUNT 3: SLANDER OF TITLE

31.  Plaintiff restates and re-alleges each of the foregoing paragraphs as though fully stated herein.

32.  Reiter drafted and recorded documents that are false and were not executed by legally authorized persons.

33.  Reiter knew or should have known that the documents were false.

34.  The documents were false because unauthorized persons without authority executed the POA and AOM.

35.  These false documents created a cloud on plaintiff's title.

36.  Plaintiff has incurred attorney's fees of $5000 and court filing costs of $322 in order to address this slander of their title.

## RELIEF

WHEREFORE Plaintiff requests entry of judgment as follows:

I.      To determine adverse interests in the Property;

II.     To declare the rights, status, legal relations or obligations of the parties, including:

a.  That the Sheriff s Certificate of Sale is void;

b.  That the 8/12/2010 AOM is void;

c.  That the 8/13/2010 POA is void;

8

   d.  That the 5/29/2012 POA is void;

   e.  That Plaintiff remains the owner of the property in fee title; and

   f.  For such other and further relief concerning the rights, status or other legal relations arising out of the mortgage loan transaction.

      a.  For costs and disbursements; and

      b.  For such other and further relief as the court deems equitable.

III.    Damages in excess of Fifty Thousand Dollars ($50,000.00).


BUTLER LIBERTY LAW, LLC

Dated:  February 14, 2013

William Bernard Butler, #227912
33 South Sixth Street
Suite 4100
Minneapolis, MN 55402
(P) 612-630-5177
Attorney for Plaintiff

**ACKNOWLEDGMENT**

The undersigned acknowledges that sanctions may be imposed pursuant to Minn. Stat. § 549.211.

Dated: February 14, 2013

# Exhibit 1

3360706

CTR. NO. 1129372

Form No. 5-M – Warranty Deed

Minnesota Uniform Conveyancing Blanks (6/1/97)

Individual(s) to Joint Tenants

No delinquent taxes and transfer entered; Certificate of
Real Estate Value ( X ) filed (   ) not required
Certificate of Real Estate Value No. _____

APR 2 7 2004

Date
PATRICK H. O'CONNOR COUNTY AUDITOR

County Auditor

By _____ _____
(Deputy)

OFFICE OF THE REGISTRAR
OF TITLES
HENNEPIN COUNTY, MINNESOTA
CERTIFIED FILED ON

MAY 13 2004  12<sup>43</sup>

REGISTRAR OF TITLES

BY _____ DEPUTY

(reserved for recording data)

DEED TAX DUE: $ 594.66
Date: April 15, 2004

FOR VALUABLE CONSIDERATION, _____Susan C. Hempel, a single person_ Grantor(s), hereby conveys and
warrants to _____Senuhe Lara and Lorena Martinez_ Grantees, as joint tenants, real
property in Hennepin County, Minnesota, described as follows:

**Lot 31, Block 2, Thorpe Bros. University Club Addition, Hennepin County, Minnesota.**

PID: 04 117 21 33 0059  *S T*

together with all hereditaments and appurtenances belonging thereto, subject to the following exceptions:
Building and zoning laws, ordinances, state and federal regulations; Restrictions relating to use or improvement of
the property without effective forfeiture provisions; Reservation of any mineral rights by the State of Minnesota;
Utility and drainage easements which do not interfere with existing improvements.

Check box if applicable:
☑ The Seller certifies that the seller does not know of any wells on the described real property.
☐ A well disclosure certificate accompanies this document.
☐ I am familiar with the property described in this instrument and I certify that the status and number of wells on
the described property have not changed since the last previously filed well disclosure certificate.

Affix Deed Tax Stamp Here

_____
Susan C. Hempel

Henn Co   SDT
RHM     # 4347
4/30/2004
Paid   $594.66

STATE OF MINNESOTA                    )
                                       ) ss.
COUNTY OF HENNEPIN                    )

This instrument was acknowledged before me on ____4-15-2004_____
by ___Susan C. Hempel, a single person_____.

_____
Signature of Notary Public or other Official

Check here if part or all of the land is Registered (Torrens) [X]

NOTARIAL STAMP OR SEAL (OR OTHER TITLE OR RANK)

DONNA MARIE HUNT
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN 31 200

My Commission Expires 1/31

Tax Statements for the real property described in this instrument should be sent to
(Include name and address of Grantee):
Grantees:
Senuhe Lara
Lorena Martinez
1633 Blackstone Avenue South

St. Louis Park, MN 55416

THIS INSTRUMENT WAS DRAFTED BY (NAME AND ADDRESS)

Burnet Title
1501 American Blvd. West
Bloomington, MN 55431
File # 4-24643
Production # 363125

RETURN TO:
Burnet Title

# Exhibit 2

3960707



3960707

_____ [Space Above This Line For Recording Data] _____

**SRRV #:**

# MORTGAGE

After Recording Return To:
CENTENNIAL MORTGAGE & FUNDING, INC.

1210 NORTHLAND DRIVE, STE 180, MENDOTA HEIGHTS, MN 55120
ATTN: POST-CLOSING DEPARTMENT

This instrument was drafted (or prepared) by:
SARA GRUBER

CENTENNIAL MORTGAGE & FUNDING, INC.

1210 NORTHLAND DRIVE #180
MENDOTA HEIGHTS, MN 55120

LARA
LOAN #: 40217
CASE #:
PIN:   04 117 21 33 0059
MIN:   100059012560027800

Henn Co    MRT
CEU      # 38951
5/3/2004
Paid    $419.76

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   APRIL 15, 2004
together with all Riders to this document.
**(B) "Borrower"** is   SENUHE LARA AND LORENA MARTINEZ, HUSBAND AND WIFE


Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is  CENTENNIAL MORTGAGE & FUNDING, INC.


Lender is a   CORPORATION                          organized and existing under the laws of
MINNESOTA .                      . Lender's address is  1210 NORTHLAND DRIVE #180
MENDOTA HEIGHTS, MN 55120
**(E) "Note"** means the promissory note signed by Borrower and dated    APRIL 15, 2004
The Note states that Borrower owes Lender
ONE HUNDRED SEVENTY-FOUR THOUSAND NINE HUNDRED AND 00/100
Dollars (U.S. $  174,900.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  MAY 1, 2034
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

MINNESOTA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                 Form 3024 1/01
DOCUKMNI
DOCUKMN1.VTX 02/04/2004                    *(Page 1 of 12 pages)*

RETURN TO:
Burnet Title

4-24643
363125

40217

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [X] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] 1-4 Family Rider
- [ ] Condominium Rider
- [ ] Planned Unit Development Rider
- [ ] Other(s)[specify]
- [ ] Second Home Rider
- [ ] Biweekly Payment Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

COUNTY              of      HENNEPIN
    (Type of Recording Jurisdiction)                 (Name of Recording Jurisdiction)

SEE ATTACHED LEGAL DESCRIPTION

MINNESOTA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                 Form 3024 1/01
DOCUKMN2
DOCUKMN2.VTX 8/20/2003             *(Page 2 of 12 pages)*

*S L.     4 M.*

40217

which currently has the address of     **1633 BLACKSTONE AVENUE SOUTH**
[Street]

**ST. LOUIS PARK**     , Minnesota     **55416**     ("Property Address"):
[City]                           [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
    **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.
    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that

MINNESOTA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                **Form 3024 1/01**
DOCUKMN3
DOCUKOO13.VTX 8/20/2003               *(Page 3 of 12 pages)*

S.L    Uhm

40217

any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a Lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

MINNESOTA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  Form 3024 1/01
DOCUKMN4
DOCU9404.VTX 8/20/2003  *(Page 4 of 12 pages)*

S. L   4, M

40217

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds

S. L     4h M

40217

shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

S.L  4 M

40217

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note. Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund..**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

MINNESOTA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
DOCUKMN7
DOCUMENT.VTX 8/20/2003
*(Page 7 of 12 pages)*

Form 3024 1/01

S.L    4.M

40217

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrume nt shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this

MINNESOTA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3024 1/01
DOCUKMN8
DOCU?O9H8 . VTX  6/20/2003     *(Page 8 of 12 pages)*

S.C   Y,M

40217

Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument at the time such documents are executed or within a reasonable time thereafter.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial

MINNESOTA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3024 1/01
DOCUKMN9
DOCUK0N9.VTX 8/20/2003       *(Page 9 of 12 pages)*

S.C    Y₃M

40217

interests transferred in a bond for deed, contract for. deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents,

MINNESOTA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                          Form 3024 1/01
DOCUKMN10
DOCU3004.VTX 8/20/2003                          *(Page 10 of 12 pages)*

SL   Um

40217

materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower by certified mail to the address of the Property or another address designated by Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees.**

**If Lender invokes the power of sale, Lender shall cause a copy of a notice of sale to be served upon any person in possession of the Property. Lender shall publish a notice of sale, and the Property shall be sold at public auction in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** Borrower waives all right of homestead exemption in the Property.

**25. Interest on Advances.** The interest rate on advances made by Lender under this Security Instrument shall not exceed the maximum rate allowed by Applicable Law.

S.C      U, M

40217

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____
- BORROWER - SENUHE LARA -   DATE -

_____
- BORROWER - LORENA MARTINEZ - DATE -

(Space Below This Line For Acknowledgment)

State of    MINNESOTA
County of  HENNEPIN

This instrument was acknowledged before me on   APRIL 15, 2004                      , by
SENUHE LARA AND LORENA MARTINEZ, HUSBAND AND WIFE

MANDI J. KING
NOTARY PUBLIC - MINNESOTA
My Comm. Expires Jan. 31, 2008

_____
(Signature of person taking acknowledgment)

(Title or Rank)_____
My Commission Expires:

MINNESOTA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3024 1/01
DOCUKMN12                                              (Page 12 of 12 pages)
DOCU%$NC.VTX 02/04/2004

# ADJUSTABLE RATE RIDER

### (1 Year Treasury Index — Rate Caps)

LARA
LOAN #: 40217
MIN:   100059012560027800

THIS ADJUSTABLE RATE RIDER is made this 15TH    day of  APRIL, 2004                    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to  CENTENNIAL MORTGAGE & FUNDING, INC.


(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
1633 BLACKSTONE AVENUE SOUTH, ST. LOUIS PARK, MN 55416

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of  4.750        %. The Note provides for changes
in the interest rate and the monthly payments as follows:

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of  MAY, 2009                          ,
and on that day every  12      month(s) thereafter. Each date on which my interest rate could change is called a
"Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the
weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made
available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each
Change Date is called the "Current Index."

MULTISTATE ADJUSTABLE RATE RIDER–ARM 4-2/5-2/6-2–Single Family–Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT

DOCUARC1
DOCUARC1.VTX 12/01/2003                    *(page  1 of 3 pages)*                    Form 3111 1/01

40217

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND THREE-FOURTHS percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.750 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO percentage points ( 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 9.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

MULTISTATE ADJUSTABLE RATE RIDER–ARM 4-2/5-2/6-2–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
DOCUARC2
DOCUARC2.VTX 12/01/2003
*(page 2 of 3 pages)*
Form 3111 1/01

S.L  U M

40217
If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

- BORROWER - SENUHE LARA - DATE -

- BORROWER - LORENA MARTINEZ - DATE -

**MULTISTATE ADJUSTABLE RATE RIDER--ARM 4-2/5-2/6-2--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

DOCUARC3
DOCUARC3.VTX 12/01/2003

*(page 3 of 3 pages)*

Form 3111 1/01

**Lot 31, Block 2, Thorpe Bros. University Club Addition, Hennepin County, Minnesota.**

# Exhibit 3



Doc No **T4779079**

Certified, filed and/or recorded on
8/13/10 3:00 PM
Office of the Registrar of Titles
Hennepin County, Minnesota
Michael H. Cunniff, Registrar of Titles
Jill L. Alverson, County Auditor and Treasurer

Deputy 47                                    Pkg ID 647514

**Doc Name: Assignment of Mortgage**

| | |
|---|---|
| Document Recording Fee | $46.00 |
| Attested Copy or Duplicate Original | $2.00 |
| ***Document Total*** | **$48.00** |

**Existing Certs**          **New Certs**

1129372

This cover sheet is now a permanent part of the recorded document.

*①* 1129372

## ASSIGNMENT OF MORTGAGE

FOR VALUABLE CONSIDERATION, Mortgage Electronic Registration Systems, Inc.,

a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a

Minnesota corporation, Assignor, hereby sells, assigns and transfers to Wells Fargo

Bank, N.A., Assignee, the Assignor's interest in the Mortgage dated April 15, 2004,

executed by Senuhe Lara and Lorena Martinez, husband and wife, as mortgagor(s) to

Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for

Centennial Mortgage & Funding, Inc. a Minnesota corporation, mortgagee, and filed for

record in the Office of the County Registrar of Titles, in and for the County of Hennepin,

Minnesota, on May 13, 2004, as Document No. 3960707and memorialized upon

Certificate of Title No. 1129372; together with all rights and interests in the note and

obligations therein specified and the debt thereby secured. Assignor covenants with

Assignee, its successors and assigns, that Assignor has good right to sell, assign and

transfer the same.

Assignee Address: 3476 Stateview Blvd, Fort Mill, SC 29715

Metro Legal Services Inc.
L . . 491

*4779079*

IN TESTIMONY WHEREOF, the said corporation has caused these presents to be executed by China Brown its Assistant Secretary, this _12_ day of _August, 2010_ .

MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.

BY: _____
China Brown

ITS: Assistant Secretary

STATE OF SOUTH CAROLINA )
                        ) ss.
COUNTY OF YORK          )

The foregoing instrument was acknowledged before me this _12_ day of _August, 2010_ , by China Brown, the Assistant Secretary of Mortgage Electronic Registration Systems, Inc., on behalf of the corporation.

_____
Notary Public

THIS INSTRUMENT WAS DRAFTED BY:

REITER & SCHILLER, P.A.
Attorneys at Law
The Academy Professional Building
25 North Dale Street
St. Paul, MN 55102-2227
Attorney Reg. No. 152262
(651) 209-9760
Z4675 maw

> CAROLYN M. EVANS
> NOTARY PUBLIC
> SOUTH CAROLINA
> MY COMMISSION EXPIRES 06/18/2019

# Exhibit 4

STATE OF MINNESOTA

DISTRICT COURT

COUNTY OF HENNEPIN

FOURTH JUDICIAL DISTRICT

---

Senuhe Lara and Lorena Martinez,

                    Plaintiffs,

Case Type:  Quiet Title

v.                                          Civil No.

Mortgage Electronic Registration System,
Wells Fargo Bank, NA, Reiter & Schiller,
PA,

**AFFIDAVIT OF PRIVATE
INVESTIGATOR**

                    Defendants.

---

STATE OF MINNESOTA )
                                   ) ss.
COUNTY OF HENNEPIN )

The affiant, being first duly sworn, deposes and states as follows:

1.      I, John Hamann, a licensed private investigator in the Minnesota (#928) and have knowledge of the all facts contained herein.

2.      On January 29, 2012 I verified that China Brown currently resides and did reside in all of 2006 at 1208 Bush River Road, Apt R6, Columbia, SC, 29210-7520.

3.      As of August 12, 2010, Brown was an employee of America's Servicing Company.

4.      America's Servicing Company's corporate location is 3476 Stateview Blvd. Fort Mill, SC 29715.

5.      China Brown executed an assignment of mortgage on August 12, 2010 as Vice President of MERS.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____

Printed Name: Jon Hamann

Signed to and sworn before me
this 31ˢᵗ day of January, 2013.

_____
Notary Public

KEVIN CLAYTON GUSTAFSON
Notary Public
State of Minnesota
My Commission Expires
January 31, 2017

# Exhibit 5



Doc No **T4779080**

Certified, filed and/or recorded on
8/13/10 3:00 PM
Office of the Registrar of Titles
Hennepin County, Minnesota
Michael H. Cunniff, Registrar of Titles
Jill L. Alverson, County Auditor and Treasurer

Deputy 47                                    Pkg ID 647514

**Doc Name: Notice of Pendency and Power of
Attorney to Foreclose**

Document Recording Fee                          $46.00

Attested Copy or Duplicate                       $2.00
Original

***Document Total***                            $48.00

**Existing Certs**          **New Certs**

1129372

This cover sheet is now a permanent part of the recorded document.

② 1129372

## NOTICE OF PENDENCY OF PROCEEDING
## AND
## POWER OF ATTORNEY TO FORECLOSE MORTGAGE

YOU ARE NOTIFIED that a proceeding is about to be commenced by the undersigned to foreclose the mortgage owned by the undersigned:

DATE OF MORTGAGE: April 15, 2004

MORTGAGOR(S): Senuhe Lara and Lorena Martinez, husband and wife

MORTGAGEE: Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation

DATE AND PLACE OF FILING: Filed May 13, 2004, Hennepin County Registrar of Titles; Document No. 3960707 and memorialized upon Certificate of Title No. 1129372

ASSIGNMENTS OF MORTGAGE: Assigned to: Wells Fargo Bank, N.A.

LEGAL DESCRIPTION OF PROPERTY:
                  Lot 31, Block 2, Thorpe Bros. University Club
                  Addition
                  REGISTERED PROPERTY

COUNTY IN WHICH PROPERTY IS LOCATED: Hennepin, Minnesota

The undersigned hereby employs and empowers Reiter & Schiller, P.A., Thomas J. Reiter, Rebecca F. Schiller, Sarah J.B. Adam, N. Kibongni Fondungallah, James J. Pauly, Leah K. Weaver and Brian F. Kidwell, Attorneys at Law, 25 North Dale Street, St. Paul, Minnesota, as the undersigned's attorneys at law to foreclose the mortgage by advertisement and to do all things necessary and incident thereto.

4779090

## NOTICE OF MORTGAGE FORECLOSURE SALE
## FORECLOSURE DATA

### Minn. Stat. § 580.025

| | |
|---|---|
| **(1) Street Address, City and Zip Code of Mortgaged Premises** | 1633 Blackstone Avenue, St. Louis Park, MN 55416 |
| **(2) Transaction Agent** | Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation |
| **(3) Name of Mortgage Originator (Lender)** | Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation |
| **(4) Residential Servicer** | Wells Fargo Home Mortgage-800-416-1472 |
| **(5) Tax Parcel Identification Number** | 0411721330059 |
| **(6) Transaction Agent's Mortgage ID Number (MERS number)** | 100059012560027800 |

**IN TESTIMONY WHEREOF**, the said corporation has caused these presents to

be executed by _China Brown_ its Vice President Loan

Documentation this _13_ day of _August, 2010_ .

WELLS FARGO BANK, N.A.

By: _____

Its: Vice President Loan Documentation

STATE OF SOUTH CAROLINA )
                        ) ss.
COUNTY OF YORK )

    The foregoing instrument was acknowledged before me, a Notary Public, this

_13_ day of _August, 2010_ , by _China Brown_ ,

as Vice President Loan Documentation of Wells Fargo Bank, N.A., a corporation under the

laws of the United States of America, on behalf of the corporation.

_____
Notary Public

THIS INSTRUMENT WAS DRAFTED BY:

Reiter & Schiller, PA
Attorneys at Law
The Academy Professional Building
25 North Dale Street
St. Paul, MN 55102-2227
(651) 209-9760
_74675 maw_

CAROLYN M. EVANS
NOTARY PUBLIC
SOUTH CAROLINA
MY COMMISSION EXPIRES 08/18/2019

# Exhibit 6



Doc No  **T4958743**

Certified, filed and/or recorded on
5/29/12 12:11 PM
Office of the Registrar of Titles
Hennepin County, Minnesota
Rachel Smith, Acting Registrar of Titles
Mark V. Chapin, County Auditor and Treasurer

Deputy 76                                    Pkg ID 808831E

**Doc Name: Notice of Pendency to Foreclose**

| | |
|---|---|
| Document Recording Fee | $46.00 |
| ***Document Total*** | **$46.00** |

**Existing Certs**          **New Certs**
1129372

This cover sheet is now a permanent part of the recorded document.

(Top 3 Inches reserved for recording data)

**NOTICE OF PENDENCY OF PROCEEDING**          Minn. Stat. 580.025, 580.032
**TO FORECLOSE MORTGAGE**

DATE: May 29, 2012

YOU ARE NOTIFIED that a proceeding is about to be commenced by the undersigned to foreclose the following described Mortgage.

## INFORMATION REGARDING MORTGAGE TO BE FORECLOSED

1.   Date of Mortgage: April 15, 2004

2.   Mortgagors: Senuhe Lara and Lorena Martinez, husband and wife

3.   Mortgagees: Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation

4.   Recording Information: Recorded on May 13, 2004 as Document Number 3960707, and memorialized upon Certificate of Title No. 1129372, in the Office of the County Registrar of Titles of Hennepin County, Minnesota.

5.   Assignments of Mortgage, if any: Assigned to Wells Fargo Bank, N.A. by written assignment recorded on August 13, 2010 as Document Number T4779079, in the Office of the County Registrar of Titles of Hennepin County, Minnesota.

## INFORMATION REGARDING MORTGAGED PREMISES

6.   Tax parcel identification number of the mortgaged premises: 0411721330059
7.   Legal description of the mortgaged premises:
     Lot 31, Block 2, Thorpe Bros. University Club Addition
     REGISTERED PROPERTY
8.   Physical street address of the mortgaged premises: 1633 Blackstone Avenue,
                                                       St. Louis Park, MN 55416

## OTHER FORECLOSURE DATA

9. Name of Transaction Agent: Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation

10. Transaction Agent's identification number: 100059012560027800

11. Name of Mortgage Originator (Lender): Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation

12. Name of Mortgage Servicer: Wells Fargo-800-416-1472

REITER & SCHILLER, P.A.

By: _____
    Rebecca F. Schiller, Esq.
    Sarah J.B. Adam, Esq.
    N. Kibongni Fondungallah, Esq.
    James J. Pauly, Esq.
    Brian F. Kidwell, Esq.
    Steven R. Pennock, Esq.
    Curt N. Trisko, Esq.
    Attorneys for Mortgagee
    25 North Dale Street
    St. Paul, MN 55102-2227
    (651) 209-9760


STATE OF MINNESOTA    )
                      )
COUNTY OF RAMSEY      )

This instrument was acknowledged before me on May 29, 2012

by _Steven R. Pennock_____ as Attorney of Reiter & Schiller, P.A.

(Seal)  STACY R MOSHER
        NOTARY PUBLIC  MINNESOTA
        MY COMMISSION
        EXPIRES 01/31/2017              _____
                                        (signature of notarial officer)

THIS INSTRUMENT WAS DRAFTED BY/
RETURN TO:
Reiter & Schiller, P.A.
The Academy Professional Building
25 N. Dale Street
St. Paul, MN 55102
(Z4675)NAM

# Exhibit 7



Doc No **T4982970**

Certified, filed and/or recorded on
8/8/12 1:00 PM
Office of the Registrar of Titles
Hennepin County, Minnesota
.Rachel Smith, Acting Registrar of Titles
Mark V. Chapin, County Auditor and Treasurer

Deputy 1                                    Pkg ID 839904M

**Doc Name: Sheriff's Certificate**

Document Recording Fee                         $46.00

*Document Total*                               $46.00

**Existing Certs**          **New Certs**

1353612

THIS DOCUMENT WAS RECORDED
IN AN ILLEGIBLE CONDITION

This cover sheet is now a permanent part of the recorded document.

1353612

# SHERIFF'S CERTIFICATE AND FORECLOSURE RECORD

TORRENS

Drafted by:

REITER & SCHILLER, P.A.
Attorneys at Law
The Academy Professional Building
25 North Dale Street
St. Paul, MN 55102
(651) 209-9760

1633 Blackstone Avenue
St. Louis Park, MN 55416
Hennepin County

Metro Legal Services Inc.
Box 491

# Affidavit of Publication

### NOTICE OF MORTGAGE FORECLOSURE SALE

**THE RIGHT TO VERIFICA- TION OF THE DEBT AND IDENTITY OF THE ORIGINAL CREDITOR WITHIN THE TIME PROVIDED BY LAW IS NOT AF- FECTED BY THIS ACTION.**
NOTICE IS HEREBY GIVEN: That default has occurred in the conditions of the following de- scribed mortgage:
DATE OF MORTGAGE: April 15, 2004
ORIGINAL          PRINCIPAL AMOUNT     OF     MORTGAGE: $174,900.00
MORTGAGOR(S): Senuba Lara and Lorena Martinez, husband and wife
MORTGAGEE: Mortgage Elec- tronic Registration Systems, Inc., a Delaware corporation as nominee for  Centennial  Mortgage  & Funding, Inc. a Minnesota corpora- tion
DATE AND PLACE OF FILING: Filed May 13, 2004, Hennepin County Registrar of Titles; Docu- ment No. 3960707 and memorial- ized upon Certificate of Title No. 1129372
ASSIGNMENTS          OF MORTGAGE: Assigned to: Wells Fargo Bank, N.A.
LEGAL     DESCRIPTION     OF PROPERTY:
Lot 31, Block 2, Thorpe Bros. University Club Addition
REGISTERED PROPERTY
STREET ADDRESS OF PROPER- TY:  1633 Blackstone Avenue, St. Louis Park, MN 55416
COUNTY IN WHICH PROPERTY IS LOCATED: Hennepin County, Minnesota
THE AMOUNT CLAIMED TO BE DUE ON THE MORTGAGE ON THE DATE OF THE NOTICE: $165,398.03
THAT no action or proceeding has been instituted at law to recover the debt secured by said mortgage, or any part thereof; that there has been     compliance     with     all pre-foreclosure notice and accelera- tion requirements of said mortgage, and/or applicable statutes;
PURSUANT, to the power of sale contained in said mortgage, the above described property will be sold by the Sheriff of said county as follows:
DATE AND TIME OF SALE: July 27, 2012 at 11:00a.m.
PLACE OF SALE: Hennepin County Sheriff's office, Hennepin County Sheriff, Room 30, Old Court- house, 350 South Fifth Street, Min- neapolis, Minnesota.
To pay the debt then secured by said mortgage and taxes, if any ac- tually paid by the mortgagee, on the premises and the costs and dis- bursements allowed by law. The

time allowed by law for redemption by said mortgagor(s), their personal representatives or assigns is six (6) months from the date of sale.
Unless said mortgage is reinstated or the property redeemed, or unless the time for redemption is reduced by judicial order, you must vacate the premises by 11:59 p.m. on Janu- ary 28, 2013.
MORTGAGOR(S)          RELEASED FROM FINANCIAL OBLIGATION ON MORTGAGE: NONE
"THE TIME ALLOWED BY LAW FOR REDEMPTION BY THE MORTGAGOR, THE MORTGAG- OR'S PERSONAL REPRESENTA- TIVES OR ASSIGNS, MAY BE RE- DUCED TO FIVE WEEKS IF A JU- DICIAL ORDER IS ENTERED UN- DER  MINNESOTA  STATUTES, SECTION     582.032,     DE- TERMINING,   AMONG   OTHER THINGS,     THAT     THE MORTGAGED  PREMISES  ARE IMPROVED WITH A RESIDEN- TIAL DWELLING OF LESS THAN FIVE     UNITS,     ARE     NOT PROPERTY. USED IN AGRICUL- TURAL PRODUCTION, AND ARE ABANDONED."
Dated: June 8, 2012
WELLS FARGO BANK, N.A.
Mortgagee
REITER & SCHILLER, P.A.
By: Rebecca F. Schiller, Esq.
Sarah J.B. Adam, Esq.
N. Kibongni Fondungallah, Esq.
James J. Pauly, Esq.
Brian F. Kidwell, Esq.
Steven R. Pennock, Esq.
Curt N. Trisko, Esq.
Attorneys for Mortgagee
25 North Dale Street
St. Paul, MN 55102-2227
(651) 209-9760
(Z4675)
**THIS IS A COMMUNICATION FROM A DEBT COLLECTOR.**
FORECLOSURE DATA
Minn. Stat. § 580.025
(1) Street Address, City and Zip Code of Mortgaged Premises 1633 Blackstone Avenue, St. Louis Park, MN 55416
(2) Transaction Agent Mortgage Electronic   Registration   Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corpora- tion
(3) Name of Mortgage Originator (Lender) Mortgage Electronic Regis- tration Systems, Inc., a Delaware corporation as nominee for Centen- nial Mortgage & Funding, Inc. a Minnesota corporation
(4) Residential Servicer Wells Far- go-800-416-1472
(5) Tax Parcel Identification Num- ber 0411721330059
(6) Transaction Agent's Mortgage ID     Number     (MERS     number) 1000590125600278000
(June 12, 19, 26,
July 3, 10, 17, 2012)

STATE OF MINNESOTA      )
                                           (SS.
COUNTY OF HENNEPIN      )

**Description:**

Wells Fargo v Lara, Senuhe & Martinez, Lorena; 1633 Blackstone Ave, St. Louis Park, 55416

Carrie Retzack                    , being duly sworn on oath say she/he is and during all times herein stated has been the publisher or the publishers designated agent in charge of the newspaper known as

# Finance and Commerce

and has full knowledge of the facts herein stated as follows:
(A)  The newspaper has complied with all of the requirements constituting qualifications as a legal newspaper, as provided by Minnesota Satute 331A.02, and 331A.07, and other applicable laws, as amended.
(B)  She/He further states on oath that the printed

Mortgage Foreclosure Sale

22307364

hereto printed as part as it was printed and published there in the English language; that it was first so published on
June 12, 2012            for            6            time(s):

the subsequent dates of publications being as follows:
6/19/2012    7/10/2012
6/26/2012    7/17/2012
7/3/2012

And that the following is a printed copy of the lower case alphabet from A to Z, both inclusive, and is hereby  acknowledged as being the size and kind of type used in the composition and publication of said notice, to wit:

abcdefghijklmnopqrstuvwxyz
abcdefghijklmnopqrstuvwxyz

Subscribed and
Sworn to before me this 17th  day of July, 2012

(Notarial Seal)                          Notary Public, Hennepin
County, Minnesota

SHAWNA RHEA SCHMITZ
Notary Public-Minnesota
My Commission Expires Jan 31, 2015

## RATE INFORMATION:

| | |
|---|---|
| 1.  Lowest classified rate paid by commercial users for comparable space: | 16.0000 |
| 2.  Maximum rate allowed by law for the above matter: | 0.28 |
| 3.  Rate actually charged for the above matter: | 0.25 |

# Affidavit of Publication

22307364



## AFFIDAVIT OF SERVICE ON OCCUPANT(S)

STATE OF MINNESOTA )
                   ) ss.
COUNTY OF RAMSEY   )

William Miller, being duly sworn, on oath says; that on the 12th of June, 2012, he went upon the land and premises described in the printed Notice of Mortgage Foreclosure Sale hereto attached for the purpose of serving said Notice, Homestead Designation, Help for Homeowners in Foreclosure, Notice of Redemption Rights and Advice to Tenants upon all persons in possession thereof; that on said date, and for sometime prior thereto Kahiro Lara, Senuhe Lara, Lorena Martinez and none other were in possession of said land; and that on said day he served said Notice, Homestead Designation, Help for Homeowners in Foreclosure, Notice of Redemption Rights and Advice to Tenants on said person(s) by handing to and leaving with Kahiro Lara personally and serving Senuhe Lara, Lorena Martinez by handing to and leaving with Kahiro Lara, a person of suitable age and discretion then residing therein, a true and correct copy thereof.

_____
William Miller

Subscribed and sworn to before me this

_____ day of ___ June ___, 20 1 2

_____
Notary Public
Z4675

PATRICIA A MILLER
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES 01/31/17

## NOTICE OF MORTGAGE FORECLOSURE SALE

**THE RIGHT TO VERIFICATION OF THE DEBT AND IDENTITY OF THE ORIGINAL CREDITOR WITHIN THE TIME PROVIDED BY LAW IS NOT AFFECTED BY THIS ACTION.**

NOTICE IS HEREBY GIVEN: That default has occurred in the conditions of the following described mortgage:

DATE OF MORTGAGE: April 15, 2004

ORIGINAL PRINCIPAL AMOUNT OF MORTGAGE: $174,900.00

MORTGAGOR(S): Scnuhc Lara and Lorena Martinez, husband and wife

MORTGAGEE: Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation

DATE AND PLACE OF FILING: Filed May 13, 2004, Hennepin County Registrar of Titles; Document No. 3960707 and memorialized upon Certificate of Title No. 1129372

ASSIGNMENTS OF MORTGAGE: Assigned to: Wells Fargo Bank, N.A.

LEGAL DESCRIPTION OF PROPERTY:
Lot 31, Block 2, Thorpe Bros. University Club Addition
REGISTERED PROPERTY

STREET ADDRESS OF PROPERTY:
1633 Blackstone Avenue, St. Louis Park, MN 55416

COUNTY IN WHICH PROPERTY IS LOCATED: Hennepin County, Minnesota

THE AMOUNT CLAIMED TO BE DUE ON THE MORTGAGE ON THE DATE OF THE NOTICE: $165,398.03

THAT no action or proceeding has been instituted at law to recover the debt secured by said mortgage, or any part thereof; that there has been compliance with all pre-foreclosure notice and acceleration requirements of said mortgage, and/or applicable statutes;

PURSUANT, to the power of sale contained in said mortgage, the above described property will be sold by the Sheriff of said county as follows:

DATE AND TIME OF SALE: July 27, 2012 at 11:00a.m.

PLACE OF SALE: Hennepin County Sheriff's office, Hennepin County Sheriff, Room 30, Old Courthouse, 350 South Fifth Street, Minneapolis, Minnesota.

To pay the debt then secured by said mortgage and taxes, if any actually paid by the mortgagee, on the premises and the costs and disbursements allowed by law. The time allowed by law for redemption by said mortgagor(s), their personal representatives or assigns is six (6) months from the date of sale.

Unless said mortgage is reinstated or the property redeemed, or unless the time for redemption is reduced by judicial order, you must vacate the premises by 11:59 p.m. on January 28, 2013.

MORTGAGOR(S) RELEASED FROM FINANCIAL OBLIGATION ON MORTGAGE: NONE

"THE TIME ALLOWED BY LAW FOR REDEMPTION BY THE MORTGAGOR, THE MORTGAGOR'S PERSONAL REPRESENTATIVES OR ASSIGNS, MAY BE REDUCED TO FIVE WEEKS IF A JUDICIAL ORDER IS ENTERED UNDER MINNESOTA STATUTES, SECTION 582.032, DETERMINING, AMONG OTHER THINGS, THAT THE MORTGAGED PREMISES ARE IMPROVED WITH A RESIDENTIAL DWELLING OF LESS THAN FIVE UNITS, ARE NOT PROPERTY USED IN AGRICULTURAL PRODUCTION, AND ARE ABANDONED."

Dated: June 8, 2012

WELLS FARGO BANK, N.A.
Mortgagee

REITER & SCHILLER, P.A.

By: _____
Rebecca F. Schiller, Esq.
Sarah J.B. Adam, Esq.
N. Kibongni Fondungallah, Esq.
James J. Pauly, Esq.
Brian F. Kidwell, Esq.
Steven R. Pennock, Esq.
Curt N. Trisko, Esq.
Attorneys for Mortgagee
25 North Dale Street
St. Paul, MN 55102-2227
(651) 209-9760
(Z4675)

**THIS IS A COMMUNICATION FROM A DEBT COLLECTOR.**

## NOTICE OF MORTGAGE FORECLOSURE SALE
## FORECLOSURE DATA

**Minn. Stat. § 580.025**

| | |
|---|---|
| **(1) Street Address, City and Zip Code of Mortgaged Premises** | 1633 Blackstone Avenue, St. Louis Park, MN 55416 |
| **(2) Transaction Agent** | Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation |
| **(3) Name of Mortgage Originator (Lender)** | Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation |
| **(4) Residential Servicer** | Wells Fargo-800-416-1472 |
| **(5) Tax Parcel Identification Number** | 0411721330059 |
| **(6) Transaction Agent's Mortgage ID Number (MERS number)** | 100059012560027800 |

# Help For Homeowners in Foreclosure

The attorney preparing this foreclosure is: **Reiter & Schiller, P.A., 25 Dale Street North, Saint Paul, MN  55102; Phone:  (651) 209-9760; FAX: (651) 292-9482.**

It is being prepared for:
**Wells Fargo-800-416-1472**
(Lender name, loss mitigation phone number)

AS OF *June 8, 2012*, this Lender says that you owe **$19,378**.45 to bring your mortgage up to date or "reinstate" your mortgage.  You must pay this amount plus interest and other costs, to keep your house from going through a sheriff's sale.  **BEFORE SENDING ANY PAYMENT, please call 651-209-9760, and choose option #1, to obtain the most current reinstatement amount.**  The sheriff's sale is scheduled for *July 27, 2012* at *11:00a.m.* at the *Hennepin County Sheriff's office.*

Mortgage foreclosure is a complex process. People may contact you with advice and offers to help "save" your home.

**Remember**: It is important that you learn as much as you can about foreclosure and your situation. Find out about all your options before you make any agreements with anyone about the foreclosure of your home.

## Getting Help

As soon as possible, you should contact your lender at the above number to talk about things you might be able to do to prevent foreclosure. You should also consider contacting the foreclosure prevention counselor in your area. A foreclosure prevention counselor can answer your questions, offer free advice, and help you create a plan which makes sense for your situation.

Contact the **Minnesota Home Ownership Center at 651-659-9336 or 866-462-6466 or www.hocmn.org** or contact the **United State Department of Housing and Urban Development** at **1-800-569-4287** or www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm?webListAction=search=MN#searchArea to get the phone number and location of the nearest certified counseling organization. Call today. The longer you wait, the fewer options you may have for a desirable result.

[Ref. Minn.Stat. § 580.041, subd. 2] 8/1/10 rev.

## HOMESTEAD DESIGNATION

"IF PART OF THE PROPERTY TO BE SOLD CONTAINS YOUR HOUSE, YOU MAY DESIGNATE AN AREA AS A HOMESTEAD TO BE SOLD AND REDEEMED SEPARATELY.

YOU MAY DESIGNATE THE HOUSE YOU OCCUPY AND ANY AMOUNT OF THE PROPERTY AS HOMESTEAD.   THE DESIGNATED HOMESTEAD PROPERTY MUST CONFORM TO THE LOCAL ZONING ORDINANCES AND BE COMPACT SO THAT IT DOES NOT UNREASONABLY REDUCE THE VALUE OF THE REMAINING PROPERTY.

YOU MUST PROVIDE THE PERSON FORECLOSING ON THE PROPERTY, THE SHERIFF, AND THE COUNTY RECORDER WITH A COPY OF THE LEGAL DESCRIPTION OF THE HOMESTEAD YOU HAVE DESIGNATED BY TEN BUSINESS DAYS BEFORE THE DATE THE PROPERTY IS TO BE SOLD."

# Foreclosure: Advice to Tenants

You are renting in a property that is in foreclosure. Minnesota law requires that we send you this notice about the foreclosure process. Please read it carefully.

**The mortgage foreclosure does not change the terms of your lease. You and your landlord must continue to follow the terms of your lease, including the rights and responsibilities of you and your landlord. You must keep paying rent unless you have a legal reason to withhold it. Your landlord must keep the property repaired. Utilities must be paid under the terms of your lease or under state law.**

**Moving out of the property early might be a violation of your lease.** The date of the sheriff's foreclosure sale is in the attached foreclosure notice. In most cases you do not need to move from the property before the sheriff's foreclosure sale. Read your lease to see if it says anything about foreclosure and about the rights you may have if the property is in foreclosure. If you have a month-to-month lease, the foreclosure notice does not change the rules for ending your lease. You and your landlord must still give legal notice to end your lease.

In most cases, your landlord has six months after the date of the sheriff's foreclosure sale to pay off the mortgage. This is called the "redemption period." Read the attached foreclosure notice to determine the length of the redemption period. You cannot be asked to move during the redemption period except for lease violations or if your lease expires during the redemption period. If your landlord stops the foreclosure, you may not have to move from the property. If your landlord does not stop the foreclosure, there will be a new owner of the property at the end of the redemption period. The new owner may have the legal right to ask you to move even if your lease is not over. But, the new owner must still give you a written notice stating that the new owner wants you to move.

Do not wait to get information about foreclosure. Mortgage foreclosure is a complicated process. It is important you learn about your rights as a renter when there is a mortgage foreclosure. You may have fewer options if you wait too long. There are government agencies and nonprofit organizations that you may contact for helpful information about the foreclosure process. For the name and telephone number of an organization near you, please call the legal aid office or bar association office in your county. You also can find information on tenant rights **at HOME Line at (866) 866-3546** and **Law Help Minnesota at http://www.LawHelpMN.org**. The state of Minnesota does not guarantee the advice of these agencies and organizations.

# NOTICE OF REDEMPTION RIGHTS

**What Happens After the Foreclosure Sale**
After the Sheriff's sale, you have the right to "redeem." Redeem means that you pay the amount
bid for your house at the sheriff's sale, plus interest and costs, to keep your house. You can
keep living in your home for a period of time after the foreclosure sale. This is called a
"redemption period," The redemption period is six (6) months after the sheriff's sale.
At the end of the redemption period, if you don't redeem or sell, you will have to leave your
home. If you do not leave, the person or company that bid on your home at the sheriff's sale has
the right to file an eviction against you in court.

**Be Careful of Foreclosure Scams**
Be Careful! After the foreclosure sale, people may approach you to buy your house or ask you
to transfer your house to them for little or no money.
Before you give up the rights to your house in any documents (including a deed), be sure
you know how much the house sold for at the sheriff's sale and decide if you can save the house
by paying the amount of the bid, plus interest and costs.

**How to Find Out How Much Your House Sold for at the Foreclosure Sale**
The amount you need to pay to redeem your house may be less that the amount you owed on
the mortgage before the sale. You can learn what this amount is (and who the winning bidder at
the sale was) by attending the sheriff's sale or contacting the sheriff's office after the sale.

**You can Also Sell Your House**
During the redemption period, if you sell your house, you must sell it for enough to pay off the
winning bidder from the sheriff's sale and pay interest, fees and other claims against the
property. If there is any money left from the sale of the house after all these debts are paid, you
can keep the money. You can also enter into a "short sale." A short sale is an agreement in
which the lender agrees to accept less than the full amount you owe on the mortgage.

**Get More Information and Advice**
For more information and advice, contact an attorney or a mortgage foreclosure prevention
counselor. You can find a mortgage foreclosure prevention counselor by contacting the
Minnesota Home Ownership Center at 651-659-9336 or 866-462-6466 or www.hocmn.org or
contact the United States Department of Housing and Urban Development at 1-800-569-4287 or
www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm?webListAction=search=MN#searchArea to get the
phone number and location of the nearest counseling organization.

## IV. AFFIDAVIT OF COSTS AND DISBURSEMENTS

STATE OF MINNESOTA     )
                                 ) ss.
COUNTY OF RAMSEY      )

       The undersigned, being first duly sworn on oath says; that he/she is the attorney foreclosing the mortgage described in the printed Notice of Mortgage Foreclosure Sale hereto attached; that the following is a detailed bill of the costs and disbursements of said foreclosure, and that the same have been absolutely and unconditionally paid or incurred therein, to wit:

| | | |
|---|---|---:|
| Attorney fees for foreclosing said mortgage | $ | 700.00 |
| Printer's fee for publishing notice of sale | | 600.00 |
| Title Report | | 50.00 |
| Fees for serving notice of sale on occupants | | 100.00 |
| Sheriff's fee for making foreclosure sale | | 65.00 |
| Recording/Filing Fees | | 92.00 |
| Lien Search | $ | 40.00 |
| | | |
| Total Costs and Disbursements | $ | 1,647.00 |

Attorney for Mortgagee

Subscribed and sworn to before me

this _26_ day of _JULY_,

20_12_.

_____
Notary Public

Christopher Bruce Linde
NOTARY PUBLIC · MINNESOTA
MY COMMISSION
EXPIRES JAN 31 2015

# V. AFFIDAVIT OF COMPLIANCE

STATE OF MINNESOTA    )
                             )ss.
COUNTY OF RAMSEY    )

The undersigned, being first duly sworn on oath, says that:

1. The Preforeclosure Notice of Opportunity for Foreclosure Prevention Counseling has been delivered in compliance with Minnesota Statute § 580.021.

2. The Foreclosure Advice Notice to Owners ("*Help for Homeowners in Foreclosure*") and the Notice of Redemption Rights have been delivered in compliance with Minnesota Statute § 580.041.

3. The Notice of Sale has been delivered in compliance with Minnesota Statute § 580.04.

4. If the property is a one-to-four family dwelling and is occupied by a tenant(s) as a residence, the Foreclosure: Advice to Tenants notice has been delivered in compliance with Minnesota Statute § 580.041.

5. The Homestead Designation Notice has been delivered in compliance with Minnesota Statute § 582.041, if applicable.

Attorney for Mortgagee

Subscribed to and sworn before me

this __26__ day of __JULY__ ,

20 _12_.

Notary Public

Christopher Bruce Lindo
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN 31 2015

## VI. SHERIFF'S CERTIFICATE OF SALE

STATE OF MINNESOTA   )
                             ) ss.
COUNTY OF HENNEPIN   )

     I, Richard W. Stanek, Sheriff of the County of Hennepin, State of Minnesota, do hereby certify; that pursuant to the printed Notice of Mortgage Foreclosure Sale hereto attached and the power of sale contained in that certain mortgage therein described, to-wit:

DATE OF MORTGAGE: April 15, 2004

MORTGAGOR(S): Senuhe Lara and Lorena Martinez, husband and wife

MORTGAGEE: Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation

DATE AND PLACE OF FILING: Filed May 13, 2004, Hennepin County Registrar of Titles; Document No. 3960707 and memorialized upon Certificate of Title No. 1129372

ASSIGNMENTS OF MORTGAGE: Assigned to: Wells Fargo Bank, N.A.

     I did at the time and place in said notice specified, to-wit:  at the main office of the Hennepin County Sheriff, Room 30, Old Courthouse, 350 South Fifth Street, in the City of Minneapolis, County of Hennepin, State of Minnesota, on **July 27, 2012** at 11:00a.m., offer for sale and sell at public auction to the highest and best bidder, the tract of land lying and being in the County of Hennepin, State of Minnesota, described as follows, to-wit:

               Lot 31, Block 2, Thorpe Bros. University Club Addition
               Hennepin County, Minnesota
               REGISTERED PROPERTY

PROPERTY ADDRESS: 1633 Blackstone Avenue, St. Louis Park, MN 55416

TRANSACTION AGENT: Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation

NAME OF MORTGAGE ORIGINATOR (LENDER): Mortgage Electronic Registration Systems, Inc., a Delaware corporation as nominee for Centennial Mortgage & Funding, Inc. a Minnesota corporation

RESIDENTIAL SERVICER: Wells Fargo-800-416-1472

TAX PARCEL IDENTIFICATION NUMBER: 0411721330059

TRANSACTION AGENT'S MORTGAGE ID NUMBER (MERS NO.): 100059012560027800

and did strike off and sell the same to **Wells Fargo Bank, N.A.** for the sum of **$168,739.96**, (with an annual interest rate of 3.0%) said purchaser being the highest bidder and said sum being the highest and best bid offered therefore; and that said sale was in all respects openly, honestly, fairly, and lawfully conducted, and the time allowed by law for redemption by the mortgagors, their personal representatives or assigns is **six (6)** months from the date of said sale.

In Testimony Whereof, I have hereunto set my hand this July 27, 2012.

Richard W. Stanek
Sheriff of Hennepin County, Minn.

Deputy

STATE OF MINNESOTA   )
                     ) ss.
COUNTY OF HENNEPIN   )

On July 27, 2012, before me personally appeared _____**Sgt. W. Jacox #508**_____, to me known to be the Deputy Sheriff of said County, and the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed as such Deputy Sheriff.

LAMAR D. ROBERTS
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2017

STATE OF MINNESOTA     )
                       ) ss.
COUNTY OF RAMSEY       )

The undersigned, being first duly sworn on oath says; that he/she knows the facts relating to the military service status of Senuhe Lara and Lorena Martinez who was/were the owner(s) of the mortgaged premises described in the foregoing Sheriff's Mortgage Foreclosure Sale thereof; that said person(s) was/were not in the military or naval service of the United States at the time of said sale, or during the nine months preceding such sale, as appears from the following facts: due inquiry by agents of the mortgagee, and further that he/she has given all notices required by Minn. Stat. §§ 580.021 & .042, 582.039, .041 & .042, as applicable, in the manner prescribed by statute.

Attorney for Mortgagee

Subscribed and sworn to before me

this _26_ day of _JULY_ ,

20_12_

_____
Notary Public

Christopher Bruce Linde
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN 31 2016

THIS INSTRUMENT WAS DRAFTED BY:

REITER & SCHILLER, P.A.
Attorneys at Law
The Academy Professional Building
25 North Dale Street, Second Floor
St. Paul, MN  55102-2227
(651) 209-9760
(Z4675)

Send Tax Information to:

Wells Fargo Bank, N.A.
Attn:  Foreclosure Dept., MAC X7801-013
3476 Stateview Boulevard
Fort Mill, SC  29715

# Exhibit 8

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY

|  |  |
|---|---|
| In the Matter of: | ) ) ) |
|  | AA-EC-11-19 |
| Wells Fargo Bank, N.A. Sioux Falls, South Dakota | ) ) ) ) |

**CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), as part of an interagency horizontal review of major residential mortgage

servicers, has conducted an examination of the residential real estate mortgage foreclosure

processes of Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Bank"). The OCC has

identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing

and in the Bank's initiation and handling of foreclosure proceedings. The OCC has informed the

Bank of the findings resulting from the examination.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has

executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 13, 2011

("Stipulation and Consent"), that is accepted by the Comptroller. By this Stipulation and

Consent, which is incorporated by reference, the Bank has consented to the issuance of this

Consent Cease and Desist Order ("Order") by the Comptroller. The Bank has committed to

taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound

practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and

foreclosure processes. The Bank has begun implementing procedures to remediate the practices addressed in this Order.

## ARTICLE I

## COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1) The Bank is among the largest servicers of residential mortgages in the United States, and services a portfolio of 8,900,000 residential mortgage loans. During the recent housing crisis, a substantially large number of residential mortgage loans serviced by the Bank became delinquent and resulted in foreclosure actions. The Bank's foreclosure inventory grew substantially from January 2009 through December 2010.

(2) In connection with certain foreclosures of loans in its residential mortgage servicing portfolio, the Bank:

(a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

(b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

2

(c)  litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;

(d)  failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;

(e)  failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and

(f)  failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

(3)  By reason of the conduct set forth above, the Bank engaged in unsafe or unsound banking practices.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §1818(b), the Comptroller hereby ORDERS that:

## ARTICLE II

### COMPLIANCE COMMITTEE

(1)  The Board shall maintain a Compliance Committee of at least three (3) directors, of which at least two (2) are outside directors who are not executive officers of the Bank or its holding company as defined in 12 C.F.R. § 215.2(e)(1) of Regulation O.  In the event of a change of the membership, the name of any new member shall be submitted to the Examiner-in-Charge for Large Bank Supervision at the Bank ("Examiner-in-Charge").  The Compliance

3

Committee shall be responsible for monitoring and coordinating the Bank's compliance with the provisions of this Order. The Compliance Committee shall meet at least monthly and maintain minutes of its meetings.

(2) Within ninety (90) days of this Order, and within thirty (30) days after the end of each quarter thereafter, the Compliance Committee shall submit a written progress report to the Board setting forth in detail actions taken to comply with each Article of this order, and the results and status of those actions.

(3) The Board shall forward a copy of the Compliance Committee's report, with any additional comments by the Board, to the Deputy Comptroller for Large Bank Supervision ("Deputy Comptroller") and the Examiner-in-Charge within ten (10) days of receiving such report.

## ARTICLE III

## COMPREHENSIVE ACTION PLAN

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan containing a complete description of the actions that are necessary and appropriate to achieve compliance with Articles IV through XII of this Order ("Action Plan"). In the event the Deputy Comptroller asks the Bank to revise the Action Plan, the Bank shall promptly make the requested revisions and resubmit the Action Plan to the Deputy Comptroller and the Examiner-in-Charge. Following acceptance of the Action Plan by the Deputy Comptroller, the Bank shall not take any action that would constitute a significant deviation from, or material change to, the requirements of the Action Plan or this

4

Order, unless and until the Bank has received a prior written determination of no supervisory objection from the Deputy Comptroller.

(2) The Board shall ensure that the Bank achieves and thereafter maintains compliance with this Order, including, without limitation, successful implementation of the Action Plan. The Board shall further ensure that, upon implementation of the Action Plan, the Bank achieves and maintains effective mortgage servicing, foreclosure, and loss mitigation activities (as used herein, the phrase "loss mitigation" shall include, but not be limited to, activities related to special forbearances, modifications, short refinances, short sales, cash-for-keys, and deeds-in-lieu of foreclosure and be referred to as either "Loss Mitigation" or "Loss Mitigation Activities"), as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions. In order to comply with these requirements, the Board shall:

(a) require the timely reporting by Bank management of such actions directed by the Board to be taken under this Order;

(b) follow-up on any non-compliance with such actions in a timely and appropriate manner; and

(c) require corrective action be taken in a timely manner for any non-compliance with such actions.

(3) The Action Plan shall address, at a minimum:

(a) financial resources to develop and implement an adequate infrastructure to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

(b) organizational structure, managerial resources, and staffing to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

(c) metrics to measure and ensure the adequacy of staffing levels relative to existing and/or future Loss Mitigation and foreclosure activities, such as limits for the number of loans assigned to a Loss Mitigation employee, including the single point of contact as hereinafter defined, and deadlines to review loan modification documentation, make loan modification decisions, and provide responses to borrowers;

(d) governance and controls to ensure compliance with all applicable federal and state laws (including the U.S. Bankruptcy Code and the Servicemembers Civil Relief Act ("SCRA")), rules, regulations, and court orders and requirements, as well as the Membership Rules of MERSCORP, servicing guides of the Government Sponsored Enterprises ("GSEs") or investors, including those with the Federal Housing Administration and those required by the Home Affordable Modification Program ("HAMP"), and loss share agreements with the Federal Deposit Insurance Corporation (collectively "Legal Requirements"), and the requirements of this Order.

(4) The Action Plan shall specify timelines for completion of each of the requirements of Articles IV through XII of this Order. The timelines in the Action Plan shall be consistent with any deadlines set forth in this Order.

ARTICLE IV

COMPLIANCE PROGRAM

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the requirements of this Order and are conducted in a safe and sound manner ("Compliance Program"). The Compliance Program shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timeframe in the Compliance Program that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge. The Compliance Program shall include, at a minimum:

(a) appropriate written policies and procedures to conduct, oversee, and monitor mortgage servicing, Loss Mitigation, and foreclosure operations;

(b) processes to ensure that all factual assertions made in pleadings, declarations, affidavits, or other sworn statements filed by or on behalf of the Bank are accurate, complete, and reliable; and that affidavits and declarations are based on personal knowledge or a review of the Bank's books and records when the affidavit or declaration so states;

(c) processes to ensure that affidavits filed in foreclosure proceedings are executed and notarized in accordance with state legal requirements and applicable guidelines, including jurat requirements;

(d) processes to review and approve standardized affidavits and declarations for each jurisdiction in which the Bank files foreclosure actions to ensure compliance with applicable laws, rules and court procedures;

(e)  processes to ensure that the Bank has properly documented ownership of the promissory note and mortgage (or deed of trust) under applicable state law, or is otherwise a proper party to the action (as a result of agency or other similar status) at all stages of foreclosure and bankruptcy litigation, including appropriate transfer and delivery of endorsed notes and assigned mortgages or deeds of trust at the formation of a residential mortgage-backed security, and lawful and verifiable endorsement and successive assignment of the note and mortgage or deed of trust to reflect all changes of ownership;

(f)  processes to ensure that a clear and auditable trail exists for all factual information contained in each affidavit or declaration, in support of each of the charges that are listed, including whether the amount is chargeable to the borrower and/or claimable by the investor;

(g)  processes to ensure that foreclosure sales (including the calculation of the default period, the amounts due, and compliance with notice requirements) and post-sale confirmations are in accordance with the terms of the mortgage loan and applicable state and federal law requirements;

(h)  processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges, and expenses, and in compliance with all applicable Legal Requirements and OCC supervisory guidance;

(i)  processes to ensure that the Bank has the ability to locate and secure all documents, including the original promissory notes if required, necessary to perform mortgage servicing, foreclosure and Loss Mitigation, or loan modification functions;

8

(j)  ongoing testing for compliance with applicable Legal Requirements and OCC supervisory guidance that is completed by qualified persons with requisite knowledge and ability (which may include internal audit) who are independent of the Bank's business lines;

(k)  measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate any changes in applicable Legal Requirements and OCC supervisory guidance;

(l)  processes to ensure the qualifications of current management and supervisory personnel responsible for mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation and loan modification, are appropriate and a determination of whether any staffing changes or additions are needed;

(m)  processes to ensure that staffing levels devoted to mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, are adequate to meet current and expected workload demands;

(n)  processes to ensure that workloads of mortgage servicing, foreclosure and Loss Mitigation, and loan modification personnel, including single point of contact personnel as hereinafter defined, are reviewed and managed.  Such processes, at a minimum, shall assess whether the workload levels are appropriate to ensure compliance with the requirements of Article IX of this Order, and necessary adjustments to workloads shall promptly follow the completion of the reviews.  An initial review shall be completed within ninety (90) days of this Order, and subsequent reviews shall be conducted semi-annually;

(o)  processes to ensure that the risk management, quality control, audit, and compliance programs have the requisite authority and status within the organization so that

appropriate reviews of the Bank's mortgage servicing, Loss Mitigation, and foreclosure activities and operations may occur and deficiencies are identified and promptly remedied;

(p)  appropriate training programs for personnel involved in mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, to ensure compliance with applicable Legal Requirements and supervisory guidance; and

(q)  appropriate procedures for customers in bankruptcy, including a prohibition on collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order.

## ARTICLE V

## THIRD PARTY MANAGEMENT

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge acceptable policies and procedures for outsourcing foreclosure or related functions, including Loss Mitigation and loan modification, and property management functions for residential real estate acquired through or in lieu of foreclosure, to any agent, independent contractor, consulting firm, law firm (including local counsel in foreclosure or bankruptcy proceedings retained to represent the interests of the owners of mortgages), property management firm, or other third-party (including any affiliate of the Bank) ("Third-Party Providers"). Third-party management policies and procedures shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timetable that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge. The policies and procedures shall include, at a minimum:

10

(a)  appropriate oversight to ensure that Third-Party Providers comply with all applicable Legal Requirements, OCC supervisory guidance (including applicable portions of OCC Bulletin 2001-47), and the Bank's policies and procedures;

(b)  measures to ensure that all original records transferred from the Bank to Third-Party Providers (including the originals of promissory notes and mortgage documents) remain within the custody and control of the Third-Party Provider (unless filed with the appropriate court or the loan is otherwise transferred to another party), and are returned to the Bank or designated custodians at the conclusion of the performed service, along with all other documents necessary for the Bank's files, and that the Bank retains imaged copies of significant documents sent to Third-Party Providers;

(c)  measures to ensure the accuracy of all documents filed or otherwise utilized on behalf of the Bank or the owners of mortgages in any judicial or non-judicial foreclosure proceeding, related bankruptcy proceeding, or in other foreclosure-related litigation, including, but not limited to, documentation sufficient to establish ownership of the promissory note and/or right to foreclose at the time the foreclosure action is commenced;

(d)  processes to perform appropriate due diligence on potential and current Third-Party Provider qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability, and to ensure adequacy of Third-Party Provider staffing levels, training, work quality, and workload balance;

(e)  processes to ensure that contracts provide for adequate oversight, including requiring Third-Party Provider adherence to Bank foreclosure processing standards, measures to enforce Third-Party Provider contractual obligations, and processes to ensure timely action with respect to Third-Party Provider performance failures;

11

(f)  processes to ensure periodic reviews of Third-Party Provider work for timeliness, competence, completeness, and compliance with all applicable Legal Requirements and supervisory guidance, and to ensure that foreclosures are conducted in a safe and sound manner;

(g)  processes to review customer complaints about Third-Party Provider services;

(h)  processes to prepare contingency and business continuity plans that ensure the continuing availability of critical third-party services and business continuity of the Bank, consistent with federal banking agency guidance, both to address short-term and long-term service disruptions and to ensure an orderly transition to new service providers should that become necessary;

(i)  a review of fee structures for Third-Party Providers to ensure that the method of compensation considers the accuracy, completeness, and legal compliance of foreclosure filings and is not based solely on increased foreclosure volume and/or meeting processing timelines; and

(j)  a certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for the Bank, on a periodic basis, as qualified to serve as Third-Party Providers to the Bank including that attorneys are licensed to practice in the relevant jurisdiction and have the experience and competence necessary to perform the services requested.

ARTICLE VI

MORTGAGE ELECTRONIC REGISTRATION SYSTEM

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy
Comptroller and the Examiner-in-Charge an acceptable plan to ensure appropriate controls and
oversight of the Bank's activities with respect to the Mortgage Electronic Registration System
("MERS") and compliance with MERSCORPS's membership rules, terms, and conditions
("MERS Requirements") ("MERS Plan").  The MERS Plan shall be implemented within one
hundred twenty (120) days of this Order.  Any corrective action timetable that is in excess of one
hundred twenty (120) days must be approved by the Examiner-in-Charge.  The MERS Plan shall
include, at a minimum:

(a)  processes to ensure that all mortgage assignments and endorsements with
respect to mortgage loans serviced or owned by the Bank out of MERS' name are executed only
by a certifying officer authorized by MERS and approved by the Bank;

(b)  processes to ensure that all other actions that may be taken by MERS
certifying officers (with respect to mortgage loans serviced or owned by the Bank) are executed
by a certifying officer authorized by MERS and approved by the Bank;

(c)  processes to ensure that the Bank maintains up-to-date corporate resolutions
from MERS for all Bank employees and third-parties who are certifying officers authorized by
MERS, and up-to-date lists of MERS certifying officers;

(d)  processes to ensure compliance with all MERS Requirements and with the
requirements of the MERS Corporate Resolution Management System ("CRMS");

(e)  processes to ensure the accuracy and reliability of data reported to
MERSCORP and MERS, including monthly system-to-system reconciliations for all MERS

13

mandatory reporting fields, and daily capture of all rejects/warnings reports associated with registrations, transfers, and status updates on open-item aging reports. Unresolved items must be maintained on open-item aging reports and tracked until resolution. The Bank shall determine and report whether the foreclosures for loans serviced by the Bank that are currently pending in MERS' name are accurate and how many are listed in error, and describe how and by when the data on the MERSCORP system will be corrected; and

(f) an appropriate MERS quality assurance workplan, which clearly describes all tests, test frequency, sampling methods, responsible parties, and the expected process for open-item follow-up, and includes an annual independent test of the control structure of the system-to-system reconciliation process, the reject/warning error correction process, and adherence to the Bank's MERS Plan.

(2) The Bank shall include MERS and MERSCORP in its third-party vendor management process, which shall include a detailed analysis of potential vulnerabilities, including information security, business continuity, and vendor viability assessments.

## ARTICLE VII

### FORECLOSURE REVIEW

(1) Within forty-five (45) days of this Order, the Bank shall retain an independent consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an independent review of certain residential foreclosure actions regarding individual borrowers with respect to the Bank's mortgage servicing portfolio. The review shall include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Bank, whether brought in the name of the Bank, the investor, the mortgage

14

note holder, or any agent for the mortgage note holder (including MERS), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review").

(2) Within fifteen (15) days of the engagement of the independent consultant described in this Article, but prior to the commencement of the Foreclosure Review, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge for approval an engagement letter that sets forth:

(a) the methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection of criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties; (iii) other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for submission and review of borrower claims and complaints); and (iv) any proposed sampling techniques. In setting the scope and review methodology under clause (i) of this sub-paragraph, the independent consultant may consider any work already done by the Bank or other third-parties on behalf of the Bank. The engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on results of the initial sampling;

(b) expertise and resources to be dedicated to the Foreclosure Review;

(c) completion of the Foreclosure Review within one hundred twenty (120) days from approval of the engagement letter; and

(d) a written commitment that any workpapers associated with the Foreclosure Review shall be made available to the OCC immediately upon request.

(3) The purpose of the Foreclosure Review shall be to determine, at a minimum:

(a) whether at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status;

(b) whether the foreclosure was in accordance with applicable state and federal law, including but not limited to the SCRA and the U.S. Bankruptcy Code;

(c) whether a foreclosure sale occurred when an application for a loan modification or other Loss Mitigation was under consideration; when the loan was performing in accordance with a trial or permanent loan modification; or when the loan had not been in default for a sufficient period of time to authorize foreclosure pursuant to the terms of the mortgage loan documents and related agreements;

(d) whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the amounts due, and compliance with notice periods) and post-sale confirmations were in accordance with the terms of the mortgage loan and state law requirements;

(e) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary;

(f) whether the frequency that fees were assessed to any delinquent borrower's account (including broker price opinions) was excessive under the terms of the borrower's loan documents, and applicable state and federal law;

16

(g)  whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of the HAMP, and consistent with the policies and procedures applicable to the Bank's proprietary loan modifications or other loss mitigation programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation option or program, any such application was handled properly, a final decision was made on a reasonable basis, and was communicated to the borrower before the foreclosure sale; and

(h)  whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the mortgagee.

(4)  The independent consultant shall prepare a written report detailing the findings of the Foreclosure Review ("Foreclosure Report"), which shall be completed within thirty (30) days of completion of the Foreclosure Review.  Immediately upon completion, the Foreclosure Report shall be submitted to the Deputy Comptroller, Examiner-in-Charge, and the Board.

(5)  Within forty-five (45) days of submission of the Foreclosure Report to the Deputy Comptroller, Examiner-in-Charge, and the Board, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the Foreclosure Report, by:

(a)  reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in accordance with this Article; and

(b)  taking appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in this Article.

17

(6)  Within sixty (60) days after the OCC provides supervisory non-objection to the plan set forth in paragraph (5) above, the Bank shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the OCC with a report detailing such payments and credits.

## ARTICLE VIII

## MANAGEMENT INFORMATION SYSTEMS

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan for operation of its management information systems ("MIS") for foreclosure and Loss Mitigation or loan modification activities to ensure the timely delivery of complete and accurate information to permit effective decision-making.  The MIS plan shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timeframe that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The plan shall include, at a minimum:

(a)  a description of the various components of MIS used by the Bank for foreclosure and Loss Mitigation or loan modification activities;

(b)  a description of and timetable for any needed changes or upgrades to:

(i)  monitor compliance with all applicable Legal Requirements and supervisory guidance, and the requirements of this Order;

(ii)  ensure the ongoing accuracy of records for all serviced mortgages, including, but not limited to, records necessary to establish ownership and the right to foreclose by the appropriate party for all serviced mortgages, outstanding balances, and fees assessed to the borrower; and

18

(iii) measures to ensure that Loss Mitigation, loan foreclosure, and modification staffs have sufficient and timely access to information provided by the borrower regarding loan foreclosure and modification activities;

(c) testing the integrity and accuracy of the new or enhanced MIS to ensure that reports generated by the system provide necessary information for adequate monitoring and quality controls.

## ARTICLE IX

### MORTGAGE SERVICING

(1) Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan, along with a timeline for ensuring effective coordination of communications with borrowers, both oral and written, related to Loss Mitigation or loan modification and foreclosure activities: (i) to ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) to ensure continuity in the handling of borrowers' loan files during the Loss Mitigation, loan modification, and foreclosure process by personnel knowledgeable about a specific borrower's situation; (iii) to ensure reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans, where appropriate; and (iv) to ensure that decisions concerning Loss Mitigation or loan modifications continue to be made and communicated in a timely fashion. Prior to submitting the plan, the Bank shall conduct a review to determine whether processes involving past due mortgage loans or foreclosures overlap in such a way that they may impair or impede a borrower's efforts to effectively pursue a loan modification, and whether Bank employee compensation practices

19

discourage Loss Mitigation or loan modifications. The plan shall be implemented within one hundred twenty (120) days of this Order. Any corrective action timeframe that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge. The plan shall include, at a minimum:

(a) measures to ensure that staff handling Loss Mitigation and loan modification requests routinely communicate and coordinate with staff processing the foreclosure on the borrower's property;

(b) appropriate deadlines for responses to borrower communications and requests for consideration of Loss Mitigation, including deadlines for decision-making on Loss Mitigation Activities, with the metrics established not being less responsive than the timelines in the HAMP program;

(c) establishment of an easily accessible and reliable single point of contact for each borrower so that the borrower has access to an employee of the Bank to obtain information throughout the Loss Mitigation, loan modification, and foreclosure processes;

(d) a requirement that written communications with the borrower identify such single point of contact along with one or more direct means of communication with the contact;

(e) measures to ensure that the single point of contact has access to current information and personnel (in-house or third-party) sufficient to timely, accurately, and adequately inform the borrower of the current status of the Loss Mitigation, loan modification, and foreclosure activities;

(f) measures to ensure that staff are trained specifically in handling mortgage delinquencies, Loss Mitigation, and loan modifications;

20

(g) procedures and controls to ensure that a final decision regarding a borrower's loan modification request (whether on a trial or permanent basis) is made and communicated to the borrower in writing, including the reason(s) why the borrower did not qualify for the trial or permanent modification (including the net present value calculations utilized by the Bank, if applicable) by the single point of contact within a reasonable period of time before any foreclosure sale occurs;

(h) procedures and controls to ensure that when the borrower's loan has been approved for modification on a trial or permanent basis that: (i) no foreclosure or further legal action predicate to foreclosure occurs, unless the borrower is deemed in default on the terms of the trial or permanent modification; and (ii) the single point of contact remains available to the borrower and continues to be referenced on all written communications with the borrower;

(i) policies and procedures to enable borrowers to make complaints regarding the Loss Mitigation or modification process, denial of modification requests, the foreclosure process, or foreclosure activities which prevent a borrower from pursuing Loss Mitigation or modification options, and a process for making borrowers aware of the complaint procedures;

(j) procedures for the prompt review, escalation, and resolution of borrower complaints, including a process to communicate the results of the review to the borrower on a timely basis;

(k) policies and procedures to ensure that payments are credited in a prompt and timely manner; that payments, including partial payments to the extent permissible under the terms of applicable legal instruments, are applied to scheduled principal, interest, and/or escrow before fees, and that any misapplication of borrower funds is corrected in a prompt and timely manner;

(l)  policies and procedures to ensure that timely information about Loss Mitigation options is sent to the borrower in the event of a delinquency or default, including plain language notices about loan modification and the pendency of foreclosure proceedings;

(m)  policies and procedures to ensure that foreclosure, Loss Mitigation, and loan modification documents provided to borrowers and third parties are appropriately maintained and tracked, and that borrowers generally will not be required to resubmit the same documented information that has already been provided, and that borrowers are notified promptly of the need for additional information; and

(n)  policies and procedures to consider loan modifications or other Loss Mitigation Activities with respect to junior lien loans owned by the Bank, and to factor the risks associated with such junior lien loans into loan loss reserving practices, where the Bank services the associated first lien mortgage and becomes aware that such first lien mortgage is delinquent or has been modified.  Such policies and procedures shall require the ongoing maintenance of appropriate loss reserves for junior lien mortgages owned by the Bank and the charge-off of such junior lien loans in accordance with FFIEC retail credit classification guidelines.

## ARTICLE X

### RISK ASSESSMENT AND RISK MANAGEMENT PLAN

(1)  Within ninety (90) days of this Order, the Bank shall conduct a written, comprehensive assessment of the Bank's risks in mortgage servicing operations, particularly in the areas of Loss Mitigation, foreclosure, and the administration and disposition of other real estate owned, including, but not limited to, operational, compliance, transaction, legal, and reputational risks.

(2) The Bank shall develop an acceptable plan to effectively manage or mitigate identified risks on an ongoing basis, with oversight by the Bank's senior risk managers, senior management, and the Board. The assessment and plan shall be provided to the Deputy Comptroller and the Examiner-in-Charge within one hundred twenty (120) days of this Order.

## ARTICLE XI

### APPROVAL, IMPLEMENTATION AND REPORTS

(1) The Bank shall submit the written plans, programs, policies, and procedures required by this Order for review and determination of no supervisory objection to the Deputy Comptroller and the Examiner-in-Charge within the applicable time periods set forth in Articles II through X. The Bank shall adopt the plans, programs, policies, and procedures required by this Order upon submission to the OCC, and shall immediately make any revisions requested by the Deputy Comptroller or the Examiner-in-Charge. Upon adoption, the Bank shall immediately implement the plans, programs, policies, and procedures required by this Order and thereafter fully comply with them.

(2) During the term of this Order, the required plans, programs, policies, and procedures shall not be amended or rescinded in any material respect without the prior written approval of the Deputy Comptroller or the Examiner-in-Charge (except as otherwise provided in this Order).

(3) During the term of this Order, the Bank shall revise the required plans, programs, policies, and procedures as necessary to incorporate new or changes to applicable Legal Requirements and supervisory guidelines.

(4)  The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the plans, programs, policies, and procedures required by this Order.

(5)  Within thirty (30) days after the end of each calendar quarter following the date of this Order, the Bank shall submit to the OCC a written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The progress report shall include information sufficient to validate compliance with this Order, based on a testing program acceptable to the OCC that includes, if required by the OCC, validation by third-party independent consultants acceptable to the OCC.  The OCC may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

(6)  All communication regarding this Order shall be sent to:

> (a)  Vance S. Price
> Deputy Comptroller
> Large Bank Supervision
> Office of the Comptroller of the Currency
> 250 E Street, SW
> Washington, DC 20219

> (b)  Scott J. Wilson
> Examiner-in-Charge
> National Bank Examiners
> 343 Sansome Street, Suite 1150
> MAC A0163-110
> San Francisco, CA, 94163-0101

## ARTICLE XII

## COMPLIANCE AND EXTENSIONS OF TIME

(1)  If the Bank contends that compliance with any provision of this Order would not be feasible or legally permissible for the Bank, or requires an extension of any timeframe within this Order, the Board shall submit a written request to the Deputy Comptroller asking for relief.  Any

24

written requests submitted pursuant to this Article shall include a statement setting forth in detail the special circumstances that prevent the Bank from complying with a provision, that require the Deputy Comptroller to exempt the Bank from a provision, or that require an extension of a timeframe within this Order.

(2) All such requests shall be accompanied by relevant supporting documentation, and to the extent requested by the Deputy Comptroller, a sworn affidavit or affidavits setting forth any other facts upon which the Bank relies. The Deputy Comptroller's decision concerning a request is final and not subject to further review.

## ARTICLE XIII

### OTHER PROVISIONS

(1) Although this Order requires the Bank to submit certain actions, plans, programs, policies, and procedures for the review or prior written determination of no supervisory objection by the Deputy Comptroller or the Examiner-in-Charge, the Board has the ultimate responsibility for proper and sound management of the Bank.

(2) In each instance in this Order in which the Board is required to ensure adherence to, and undertake to perform certain obligations of the Bank, it is intended to mean that the Board shall:

(a) authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of this Order;

(b) require the timely reporting by Bank management of such actions directed by the Board to be taken under the terms of this Order;

(c) follow-up on any material non-compliance with such actions in a timely and appropriate manner; and

25

(d) require corrective action be taken in a timely manner of any material non-compliance with such actions.

(3) If, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States to undertake any action affecting the Bank, nothing in this Order shall in any way inhibit, estop, bar, or otherwise prevent the Comptroller from so doing.

(4) This Order constitutes a settlement of the cease and desist proceeding against the Bank contemplated by the Comptroller, based on the unsafe or unsound practices described in the Comptroller's Findings set forth in Article I of this Order. Provided, however, that nothing in this Order shall prevent the Comptroller from instituting other enforcement actions against the Bank or any of its institution-affiliated parties, including, without limitation, assessment of civil money penalties, based on the findings set forth in this Order, or any other findings.

(5) This Order is and shall become effective upon its execution by the Comptroller, through his authorized representative whose hand appears below. The Order shall remain effective and enforceable, except to the extent that, and until such time as, any provision of this Order shall be amended, suspended, waived, or terminated in writing by the Comptroller.

(6) Any time limitations imposed by this Order shall begin to run from the effective date of this Order, as shown below, unless the Order specifies otherwise.

(7) The terms and provisions of this Order apply to the Bank and its subsidiaries, even though those subsidiaries are not named as parties to this Order. The Bank shall integrate any foreclosure or mortgage servicing activities done by a subsidiary into its plans, policies, programs, and processes required by this Order. The Bank shall ensure that its subsidiaries comply with all terms and provisions of this Order.

26

(8)  This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form, a contract binding the Comptroller or the United States.  Nothing in this Order shall affect any action against the Bank or its institution-affiliated parties by a bank regulatory agency, the United States Department of Justice, or any other law enforcement agency, to the extent permitted under applicable law.

(9)  The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

(10)  Nothing in the Stipulation and Consent or this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order.

(11)  The Bank consents to the issuance of this Order before the filing of any notices, or taking of any testimony or adjudication, and solely for the purpose of settling this matter without a formal proceeding being filed.


IT IS SO ORDERED, this 13th day of April, 2011.



____/s/_____
Vance S. Price
Deputy Comptroller
Large Bank Supervision

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY

|  |  |
|---|---|
| **In the Matter of:** ) | |
| Wells Fargo Bank, N.A. ) | AA-EC-11-19 |
| Sioux Falls, South Dakota ) | |
| ) | |

## STIPULATION AND CONSENT TO THE ISSUANCE
## OF A CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller")

intends to impose a cease and desist order on Wells Fargo Bank, N.A., Sioux Falls, South

Dakota ("Bank") pursuant to 12 U.S.C. § 1818(b), for unsafe or unsound banking

practices relating to mortgage servicing and the initiation and handling of foreclosure

proceedings.

The Bank, in the interest of compliance and cooperation, enters into this

Stipulation and Consent to the Issuance of a Consent Order ("Stipulation") and consents

to the issuance of a Consent Order, dated April 13, 2011 ("Consent Order");

In consideration of the above premises, the Comptroller, through his authorized

representative, and the Bank, through its duly elected and acting Board of Directors,

stipulate and agree to the following:

ARTICLE I
JURISDICTION

(1)    The Bank is a national banking association chartered and examined by the

Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et*

*seq.*

(2)    The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(3)    The Bank is an "insured depository institution" within the meaning of 12 U.S.C. § 1818(b)(1).

(4)    For the purposes of, and within the meaning of 12 C.F.R. §§ 5.3(g)(4), 5.51(c)(6), and 24.2(e)(4), this Consent Order shall not be construed to be a "cease and desist order" or "consent order", unless the OCC informs the Bank otherwise.

## ARTICLE II
## AGREEMENT

(1)    The Bank, without admitting or denying any wrongdoing, consents and agrees to issuance of the Consent Order by the Comptroller.

(2)    The Bank consents and agrees that the Consent Order shall (a) be deemed an "order issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2), (b) become effective upon its execution by the Comptroller through his authorized representative, and (c) be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

(3)    Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as a matter of contract law. The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

2

(4)     The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Consent Order and/or execute the Consent Order.

(5)     The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(6)     The OCC releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the OCC based on the banking practices described in the Comptroller's Findings set forth in Article I of the Consent Order, to the extent known to the OCC as of the effective date of the Consent Order. However, the banking practices alleged in Article I of the Consent Order may be utilized by the OCC in other future enforcement actions against the Bank or its institution-affiliated parties, including, without limitation, to assess civil money penalties or to establish a pattern or practice of violations or the continuation of a pattern or practice of violations. This release shall not preclude or affect any right of the OCC to determine and ensure compliance with the terms and provisions of this Stipulation or the Consent Order.

(7)     The terms and provisions of the Stipulation and the Consent Order shall be binding upon, and inure to the benefit of, the parties hereto and their successors in interest. Nothing in this Stipulation or the Consent Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any

3

benefit or any legal or equitable right, remedy or claim under this Stipulation or the Consent Order.

## ARTICLE III
## WAIVERS

(1)    The Bank, by consenting to this Stipulation, waives:

(a)    the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818(b);

(b)    any and all procedural rights available in connection with the issuance of the Consent Order;

(c)    all rights to a hearing and a final agency decision pursuant to 12 U.S.C. §§ 1818(b) and (h), 12 C.F.R. Part 19;

(d)    all rights to seek any type of administrative or judicial review of the Consent Order;

(e)    any and all claims for fees, costs or expenses against the Comptroller, or any of his agents or employees, related in any way to this enforcement matter or this Consent Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

(f)    any and all rights to challenge or contest the validity of the Consent Order.

4

## ARTICLE IV
## OTHER PROVISIONS

(1)     The provisions of this Stipulation shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting the Bank if, at any time, it deems it appropriate to do so to fulfill the responsibilities placed upon it by the several laws of the United States of America.

(2)     Nothing in this Stipulation shall preclude any proceedings brought by the Comptroller to enforce the terms of this Consent Order, and nothing in this Stipulation constitutes, nor shall the Bank contend that it constitutes, a waiver of any right, power, or authority of any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice, to bring other actions deemed appropriate.

(3)     The terms of the Stipulation and the Consent Order are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.


IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his representative, has hereunto set his hand on behalf of the Comptroller.


/s/                                                         April 13, 2011

Vance S. Price                                    Date
Deputy Comptroller
Large Bank Supervision


5

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting

Board of Directors of the Bank, have hereunto set their hands on behalf of the Bank.


/s/
David A. Hoyt

3.31.11
Date


/s/
Michael J. Loughlin

3.31.11
Date


/s/
Mark C. Oman

3/31/11
Date


/s/
John G. Stumpf

Date


/s/
Carrie L. Tolstedt

3.31.11
Date


6